UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CAUSE NUMBER 3:15cr16RLM |
| | ) | |
| ANTHONY SHOCKEY | ) | |

OPINION AND ORDER

Anthony Shockey moves to suppress statements he made in response to questions by law enforcement agents in his home. He contends his constitutional rights were violated because no *Miranda* warnings were given and he wasn't free to leave his home because he was on home detention. The court denies his motion to dismiss because the police interrogation wasn't custodial.

The parties stipulated to the following facts.

    1.    A January 2015 investigation by Peru, Indiana, police department led officers to believe that Shockey possessed a stolen firearm, and possibly other stolen items, at his home.
    2.    On Janury 27, 2015, Special Agent Laurie Jolley, of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, and Dets. Grant and Ulery, of the Peru Police Department, went to Shockey's home to interview him at approximately 11:30 AM. The officers suspected Shockey would be at home because they knew he was on electronic home detention. The officers were not in uniform, and Dets. Grant and Ulery had dealt with Shockey on multiple prior occasions. SA Jolley wore an audio recording device.
    3.    Officers knocked on Shockey's door and announced their presence. They waited approximately 12 minutes for Shockey to open the door and let them into the residence.
    4.    The interview of Shockey occurred in his living room. There were multiple other rooms in Shockey's residence. The interview began at approximately 11:42 AM and ended at 12:07 PM. The officers never drew their weapons, made any physical contact

with Shockey, physically threatened him, or prevented him from moving about or exiting his home.

5. [Immediately f]ollowing the interview, Shockey cooperated with the officers and called an individual, stated that he was interesting in buying a gun, and arranged a meeting with the individual. The meeting ultimately did not occur. Officers left without arresting Shockey.

The recording of the interview was played during the hearing on the suppression motion. Its quality is uneven at best. It appears that the interview involved three identifiable parts. At the outset, the officers sought to explain why Mr. Shockey should help them. In the middle, the officers obtained information from Mr. Shockey, primarily relating to area burglaries in which firearms had been stolen. The officers seemed to believe some of the stolen firearms had made their way to Mr. Shockey's residence, but didn't seem to think Mr. Shockey was involved in the burglaries. The final part of the recording consisted of the officers encouraging Mr. Shockey to cooperate with them by placing phone calls.

The officers didn't read Mr. Shockey formal *Miranda* warnings. They told him neither that he was free to leave nor that he wasn't free to leave. They didn't tell him he had the right to terminate questioning, or that his statements could be used against him in court. The government and Mr. Shockey agree that what occurred was an "interrogation" for federal constitutional purposes, and that admissibility turns on whether Mr. Shockey was "in custody."

A suspect is in custody when the circumstances of the questioning are such that "a reasonable person [would] have felt he or she was not at liberty to

2

terminate the interrogation and leave." Howes v. Fields, 132 S. Ct. 1181, 1189 (2012) (quoting Thompson v. Keohane, 516 U.S. 99, 100 (1995)). This inquiry is based purely on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994). Our court of appeals has characterized the "in custody" test as hinging on whether the person being questioned was deprived of his or her freedom of action in any significant way. *See* United States v. Snodgrass, 635 F.3d 324, 327 (7th Cir. 2011) (citing United States v. Thompson, 496 F.3d 807, 810 (7th Cir. 2007)).

Mr. Shockey says that because he was confined to his home as part of his sentence in an unrelated case, he wasn't free to leave. That isn't entirely so: nothing in the record suggests that he couldn't have left the living room, where the interrogation was taking place, and gone into another of the house's rooms. The government argues that Mr. Shockey also could have phoned whatever agency was monitoring his home detention and asked for permission to leave, but the court isn't persuaded: nothing in the record indicates what it would have taken for Mr. Shockey to get permission to leave his house.

In any event, pre-existing restraints on one's freedom, without additional restraints imposed during interrogation, don't render an interrogation "custodial" for *Miranda* purposes. Maryland v. Schatzer, 559 U.S. 98, 113 (2010) ("lawful imprisonment imposed upon conviction of a crime does not create the coercive

3

pressures identified in *Miranda*."). The pre-existing restraints — such as home detention — remain in the picture, but the inquiry focuses on the freedom to terminate questioning. Ultimately, the defining question is "whether the relevant environment presents the same inherently coercive pressures as the time of station house questioning at issue in *Miranda*." Howes v. Fields, 132 S. Ct. 1181, 1190 (2012).

There is no exhaustive list of factors to consider in this inquiry. Courts have identified as relevant whether: the encounter occurred in a public place; the defendant agreed to speak to the law enforcement agents; the officers told the defendant that he wasn't under arrest; the defendant was moved to another area; the presence of several officers and/or a display of weapons or physical force created a threatening atmosphere; the officers deprived the defendant of documents needed to depart; and the officers' tone of voice was such that their requests likely would be obeyed. United States v. Barker, 467 F.3d 625, 629 (7th Cir. 2006) (quoting United States v. Wyatt, 179 F.3d 532, 535 (7th Cir. 1999)). Also significant are the duration of the questioning, statements made by officers during the interrogation, the presence or absence of physical restraints during the questioning, and whether the interviewee was released at the end of questioning. *See* United States v. Borostowski, 775 F.3d 851, 859-860 (7th Cir. 2014).

*Location of the encounter.* The encounter between Mr. Shockey and the law enforcement personnel occurred in Mr. Shockey's living room, a familiar and non-

4

threatening place. *See* United States v. James, 113 F.3d 721, 727 (7th Cir. 1997) (atmosphere during encounter in defendant's office was "relaxed and casual."). The officers arrived at the home in late morning; this was no late-night entry, as in Orozco v. Texas, 394 U.S. 324, 326-327 (1969), or night-time dark alley encounter, as in United States v. Smith, 794 F.3d 681, 685-686 (7th Cir. 2015). The officers knew Mr. Shockey was confined to his home. They didn't specifically tell Mr. Shockey that he was free to end the encounter at any time. *Compare* Howes v. Field, 132 S. Ct. at 1193 ("Most important, respondent was told at the outset of the interrogation, and was reminded again thereafter, that he could leave and go back to his cell whenever he wanted."). That the encounter occurred in the defendant's home isn't dispositive of the "custody" issue. *See* United States v. Wallace, 753 F.3d 671, 674 (7th Cir. 2014) ("The statement was made in a custodial setting. The suspects in the front room, including the defendant, were in police custody; they were being overseen by a DEA agent and, the government concedes, were not free to leave the room.").

*Initial consent.* Mr. Shockey consented to speak with the officers when they knocked at his door. He admitted them into his home.

*Statement whether defendant was under arrest.* The officers didn't tell Mr. Shockey that he wasn't under arrest. The tenor of the first part of the encounter was ambiguous on this point, as the officers — in hopes of encouraging Mr. Shockey to cooperate with them — explained that they already had enough

5

information to arrest him. Special Agent Jolley told Mr. Shockey at one point that they could arrest Mr. Shockey but weren't going to; whether that meant he wouldn't be arrested before the officers left was unstated. As the encounter continued without the officers announcing that Mr. Shockey was under arrest, it became more evident that Mr. Shockey wasn't under arrest.

*Movement from one place to another.* When Mr. Shockey let the officers into his home, he took them to the living room. That's where the rest of the encounter took place. *Compare* United States v. Slaight, 620 F.3d 816, 820 (7th. Cir. 2010) (officers took defendant to station interview from his bedroom at gunpoint, all the while telling him he was free to leave).

*Threatening circumstances.* Three officers were present. The record discloses nothing about the size of the room or of the officers, so the court can't evaluate how dominating the officers might have seemed to Mr. Shockey. The parties stipulated that Mr. Shockey and the two Peru officers were familiar with each other, but without knowing the context of the prior acquaintance, the court can't evaluate whether Mr. Shockey's knowledge of the officers would have been reassuring. None of the three officers were in uniform, strongly suggesting that weapons were not displayed. The parties stipulated that the officers didn't physically threaten Mr. Shockey.

*Access to documents needed to leave.* The law enforcement personnel didn't deprive Mr. Shockey of any documents.

6

*Tone of voice.* The officers' tone of voice was not threatening nor commanding. Mr. Shockey might have considered the content of some of what the officers told him to be threatening, but their tone was non-confrontational.

*Duration of encounter.* The encounter was brief — about 25 minutes.

*Interrogators' statements.* Most of what the officers said (after the beginning of the conversation, which dealt with what they knew about Mr. Shockey's own criminal conduct) didn't focus on Mr. Shockey. The officers made clear that they were interested in two men who were thought to have been involved in area burglaries in which guns were being stolen. The officers asked for Mr. Shockey's help in making a case against them.

*Physical restraint.* Mr. Shockey was not physically restrained at any point in the conversation.

*Post-enounter arrest.* The officers didn't arrest Mr. Shockey at the end of the encounter. They left, without Mr. Shockey, after he placed a call in an effort to help the investigation.

In summary, the officers came to Mr. Shockey's house in the middle of the day, knocked to obtain entry, waited more than ten minutes to allow him to get ready to answer the door, and were admitted into the home and led to the living room by Mr. Shockey. The officers didn't arrest Mr. Shockey, either immediately or ultimately. They spoke with him in non-confrontational tones of voice, made no physical or verbal threats, weren't in uniform, and displayed no weapons. While

the encounter began with reference to Mr. Shockey's potential crimes, the questions were devoted more to what others were doing than to what Mr. Shockey might have been doing. The conversation lasted less than half an hour, and some of that time was devoted not to questioning, but to trying to persuade Mr. Shockey to make a phone call for the investigators. Mr. Shockey couldn't leave the house, but that restraint on his freedom was from another criminal case, not from this interrogation. Under the circumstances just described, Mr. Shockey was not "subjected to a degree of restraint associated with that of a formal arrest." United States v. Fazio, 914 F.2d 950, 955 (7th Cir. 1990).

The court DENIES Mr. Shockey's motion to suppress (doc. #15).

ENTERED:  September 8, 2015

  /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Judge
United States District Court